**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

)
DANIEL ABI-AAD,                                            )
                                                                       )
                    Plaintiff,                                    )
                                                                       )
                                                                       )        Civil Action No. 21-CV-11862-AK
v.                                                                   )
                                                                       )
UNUM GROUP, UNUM                                    )
INSURANCE COMPANY OF AMERICA, )
                                                                       )
                    Defendant.                                 )
_____)

**MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**A. KELLEY, D.J.**

Plaintiff Daniel Abi-Aad ("Abi-Aad") has filed suit pursuant to Section 502 of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to

recover long-term disability ("LTD") benefits denied by Defendants Unum Group and UNUM

Life Insurance Company of America (collectively "Unum") (Count I).  [Dkt. 1].  Abi-Aad also

brings an action for attorneys' fees and costs pursuant to 29 U.S.C. Section 1132(g) (Count II).

[Id.].  Abi-Aad and Unum have filed cross-motions for summary judgment.  [Dkt. 28, Dkt. 31].

For the following reasons, Abi-Aad's motion for summary judgment [Dkt. 31] is **DENIED**, and

Unum's motion for summary judgment [Dkt. 28] is **GRANTED**.

**I.       BACKGROUND**

Abi-Aad initiated this action seeking judicial review of Unum's decision to deny LTD

benefits due to a physical condition.  [Dkt. 1].  The parties do not dispute that Unum provided

Abi-Aad LTD benefits due to mental illness from March 7, 2018 to March 6, 2020.  [Dkt. 34-2 at

222; Dkt. 34-4 at 498-99].  Abi-Aad asserts that when Unum terminated his disability benefits

due to mental illness on March 6, 2020, he was eligible for continued LTD benefits because he was simultaneously suffering from a physical disability.  [See Dkt. 32 at 2-3 (stating that "Unum approved Abi-Aad's benefits based on anxiety and depression only, ignoring that he was also physically disabled")].

While Abi-Aad was receiving benefits for his mental illness, one of his treatment providers notified Unum that Abi-Aad had chronic pain, a potential physical disability, on February 3, 2020.  [Dkt. 34-4 at 387].  Pursuant to the Policy, Unum conducted multiple medical reviews of his condition.  [Dkts. 42-1, 42-2, 42-3, 42-4, 42-5, 42-6].  After one non-physician reviewer and two reviewing physicians independently formed conclusions that Abi-Aad did not meet the definition of disabled, Unum notified Abi-Aad that his benefits reached the maximum benefit period for a mental illness disability and terminated his benefits.  [Dkt. 34-4 at 498-501].

On October 16, 2020, Abi-Aad appealed Unum's decision to terminate his LTD benefits and provided additional information, including a Physical Residual Functional Capacity Assessment ("FCE").  [Dkt. 34-5 at 205-10, 254].  Unum first had a physician evaluate whether the additional information should invoke a new review of Abi-Aad's claim or whether Abi-Ad's claim should directly proceed to the appeal process to uphold or reverse Unum's previous decision.  [See Dkt. 42-4].  After the physician determined that the additional information Abi-Aad provided should not invoke a new review of his physical disability claim, Unum submitted Abi-Aad's claim to two physicians on appeal and upheld its decision to terminate Abi-Aad's claim.  [See Dkts. 42-5, 42-6; see also Dkt. 34-5 at 333-43].

Abi-Aad was covered by an employee benefit plan ("the Policy") administered by Unum and provided by his former employer, Symbotic LLC Plan ("Symbotic").  [See Dkt. 34 at 4-59]. The Plan is governed by ERISA.  [Id. at 51-57].  Unum is the claim administrator and bears the

responsibility for paying the disability benefits.  [See id. at 33].  Abi-Aad has a Bachelor of

Science degree from Notre Dame University in Computer Science, and a master's degree in

Computer Science from Tufts University.  [Dkt. 34-4 at 106].  Abi-Aad has worked in the

computer software and information technology ("IT") industry for approximately twenty years.

[Id. at 101-106].  As Symbotic's Director of Software Quality Assurance since 2015, Abi-Aad's

job required "frequent reaching, handling, fingering, [and] keyboard use," along with hiring,

traveling, and building products.  [Dkt. 34-3 at 82].

A.      **The Policy**

The parties do not dispute the contents of the Policy.  The Policy defines "disability" as

the following:

> You are disabled when Unum [Life] determines that:  you are **limited** from
> performing the **material and substantial duties** of your **regular occupation** due
> to your **sickness** or **injury**; and you have a 20% or more loss in your **indexed
> monthly earnings** due to the same sickness or injury.  After 24 months of
> payments, you are disabled when Unum [Life] determines that due to the same
> sickness or injury, you are unable to perform the duties of any **gainful occupation**
> for which you are reasonably fitted by education, training or experience.

[Dkt. 34 at 31].

The Policy limits LTD benefits for mental illnesses to twenty-four months.  [Id. at 38].

The Policy defines "mental illness" as follows:

> MENTAL ILLNESS means a psychiatric or psychological condition classified in
> the Diagnostic and Statistical Manual of Mental Health Disorders (DSM),
> published by the American Psychiatric Association, most current as of the start of
> a disability.  Such disorders include, but are not limited to, psychotic, emotional or
> behavioral disorders, or disorders relatable to stress.  If the DSM is discontinued or
> replaced, these disorders will be those classified in the diagnostic manual then used
> by the American Psychiatric Association as of the start of a disability.

[Id. at 48].  Disability due to mental illness is limited as follows:

The lifetime cumulative maximum benefit period for all disabilities due to **mental illness** is 24 months.  Only 24 months of benefits will be paid even if the disabilities: are not continuous; and/or are not related.

However, Unum will send you payments beyond the 24-month period if you meet one of these conditions:

1.  If you are confined to a **hospital or institution** at the end of the 24 month period, Unum will continue to send you payments during your confinement.

    If you are still disabled when you are discharged, Unum will send you payments for a recovery period of up to 90 days.

    If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, Unum will send payments during that additional confinement and for one additional recovery period up to 90 more days.

2.  If you are not confined to a hospital or institution but become confined for a period of at least 14 days within 90 days after the 24-month period for which you have received payments, Unum will send payments during the length of the confinement.

[Id. at 38].

If the disability is caused by a mental illness and physical disability, Unum's Benefit Center Claims Manual ("the Claims Manual") states that an individual may apply a physical limitation concurrently.  [Dkt. 43-1 at 14].  The mental illness 24-month limitation does not apply when there is a concurrent physical impairment.  [Id. at 13-14].  However, those months where the employee is disabled solely due to a mental illness do count towards the 24-month limitation.  [Id. at 14].

Although Abi-Aad does not argue that his 24-month limitation clock for benefits due to mental illness should have been tolled, he does argue that Unum was aware that he had a concurrent physical impairment, and that therefore, his LTD disability benefits should not have ended on March 6, 2020.  [Dkt. 32 at 2; Dkt. 43 at 1].  The parties do not dispute that to qualify for continued LTD benefits under the Policy, Abi-Aad must meet the definition of disabled by

proving that he was unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience due to physical disability, prior to the termination of his benefits for mental illness on March 6, 2020.  [Dkt. 29 at 15; Dkt. 32 at 1-2].

**B.     Gainful Employment**

After a claimant receives twenty-four months of payment for a disability, Unum life will determine if the claimant is disabled if the same sickness or injury renders the claimant unable to perform the duties of any gainful occupation for which they are reasonably fitted.  [Dkt. 34 at 31].

Gainful occupation is defined in the Policy as "an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working: or 60% of your indexed monthly earnings, if you are not working."  [Id. at 46].  Unum evaluates the ability for an employee to perform their own or any occupation in terms of the claimant's specific medical restrictions and limitations and their specific material and substantial occupational duties.  [Dkt. 43-1 at 2].  While usage of the Dictionary of Occupational Titles ("DOT") physical demands (sedentary, light, medium, heavy, and very heavy) and frequency descriptors (occasional, frequent, prolonged and constant) are a starting point to determine a claimant's ability to perform a gainful occupation, they are insufficient as standalone descriptions.  [Id.].

To determine the employee's capacity to perform their own occupation or any occupation, claimants must provide further information on their ability to perform the occupation based on physical demands involving movement (e.g., balancing, climbing, stooping, fingering, handling, etc.), auditory and visual requirements, environmental hazards, work hazards, equipment usage, and cognitive skills required.  [Id. at 2-3].  Unum must consider all the data

obtained during the claim evaluation process when making the decisions regarding liability, and internal medical resources may be used to assist with the analysis of the medical information provided.  [See id. at 4-7]  If Unum's medical source reaches a different conclusion, Unum documents the claim file with the differing conclusions and makes peer-to-peer contact through a phone call or letter in an effort to explain and resolve the differences.  [Id. at 9-11].

### C.    Approval of LTD Benefits Due to Mental Illness

Unum approved Abi-Aad for LTD benefits relating to mental illness to begin on March 7, 2018 [Dkt. 34-2 at 222], and it terminated his benefits on March 6, 2020 [Dkt. 34-4 at 368].  Abi-Aad has a medical history of general anxiety disorder and depression.  [Dkt. 34-2 at 74].  On November 14, 2017, Unum informed Abi-Aad that he would be losing his job, but allowed him to stay until the end of 2017 to find new employment.  [Dkt. 34-1 at 452].  On December 5, 2017, Abi-Aad saw his healthcare provider complaining of stress and lack of sleep, and he ceased working on December 7, 2017.  [Dkt. 34-2 at 74-75, 217].  Abi-Aad was treated at the emergency room for lack of sleep, stress, and mild nausea on December 8, 2017, where he obtained "[a]n extended-leave work note."  [Id. at 319, 322].  Abi-Aad submitted a claim for Short Term Disability ("STD") benefits, and his health professional provided Unum an attending physician statement with a primary diagnosis of anxiety and a secondary diagnosis of acute depression.  [Dkt. 34-1 at 70-71].  Abi-Aad's STD benefits were approved starting December 7, 2017 [id. at 402-403], and after submitting an LTD request, Abi-Aad's LTD benefits were approved starting March 7, 2018 for depression, anxiety, and post traumatic stress disorder [Dkt. 34-2 at 222].  In May 2019, Unum reminded Abi-Aad that his benefits would expire in March 2020.  [Dkt. 34-4 at 51-52].

D.     **LTD Benefits Due to Physical Disabilities**

To support his physical disability claim, Abi-Aad provided medical documentation from Joseph B. Taylor ("Dr. Taylor"), Amy Devlin, MD ("Dr. Devlin") and Sharon Stotsky, M.D. ("Dr. Stotsky").  In its review and appeals process, Chidambara Jha, M.D. ("Dr. Jha"), James Haller, M.D. ("Dr. Haller"), Crystal D. Bright, M.D. ("Dr. Bright"), Norman H. Bress, M.D. ("Dr. Bress"), and Scott B. Norris, M.D. ("Dr. Norris") evaluated Abi-Aad's claim to support Unum's decision to terminate his LTD benefits.

1.     **Dr. Taylor and Dr. Devlin (Abi-Aad's physicians)**

On March 10, 2017, Abi-Aad's treating physician noted his complaints of "wrist pain and finger numbness."  [Dkt. 34-2 at 82].  Abi-Aad's treating physician performed an electrocardiogram ("EKG") and noted that he should see an orthopedic to evaluate whether he had carpal tunnel or radiculopathy.[1]  [Id. at 84-85].  Dr. Taylor began treating Abi-Aad on June 12, 2019, where he documented that Abi-Aad visited for "joint pain."  [Dkt. 34-4 at 301].  Dr. Taylor recorded a primary diagnosis of "pain of both wrist joints," but found "no evidence of obvious swelling or other inflammatory markers" and stated rheumatoid arthritis was "doubtful."  [Id. at 301-05].  On August 6, 2019, Dr. Taylor provided a diagnosis of osteoarthritis of ankle and foot, referred Abi-Aad to rheumatology, and ordered an x-ray for his right wrist, which returned normal.  [Id. at 229-301, 318].  On September 25, 2019, Dr. Devlin, a rheumatologist, performed an evaluation, prescribed an opioid, and ordered lab tests and x-rays. [Id. at 229-33].  Abi-Aad's lab tests and x-rays of his sacroiliac joints, hips, pelvis, and hands returned normal.  [Id. at 225, 234-47].  Dr. Devlin re-evaluated Abi-Aad on October 30, 2019, and documented Abi-Aad's self-reported symptoms of pain "may be more neurogenic/neuropathy linked" but

---

[1] Abi-Aad's treating physician also tested him for a rheumatoid factor, which came back negative.  [Dkt. 34-2 at 91].

ordered an electromyography ("EMG") to explore the possibility of arthritis.  [<u>Id.</u> at 225-28].  On

November 6, 2019, Dr. Taylor re-examined Abi-Aad, and provided a new diagnosis of chronic

pain syndrome and prescribed use of an opioid.  [<u>Id.</u> at 294-97].

Between 2019 and 2020, Unum, pursuant to their Policy [Dkt. 34 at 12], performed

multiple vocational assessments which determined that Abi-Aad had the skills within his

physical capacity for other gainful occupations, including software development manager, IT

computer programming supervisor, and IT audit manager.  [Dkt. 34-4 at 131-32, 482-84].  These

occupations involve mostly sitting, with the ability to change positions for brief periods

throughout the day, and lifting, carrying, pushing, occasional pulling, and frequent fingering, but

do not require greater than the occasional reaching and handling.  [<u>Id.</u> at 484].

Dr. Taylor responded to correspondence from Unum on November 19, 2019, stating that

the medical conditions that prevented Abi-Aad from performing his occupation were "severe

anxiety and PTSD."  [<u>Id.</u> at 179].  Abi-Aad was informed of Dr. Taylor's response on December

5, 2019, and asked Unum to resend the letter because "they misunderstood the form."  [<u>Id.</u> at

275, 277].  On December 6, 2019, Dr. Taylor responded to correspondence from Unum

requesting "clarification regarding Daniel Abi-Aad's work capacity."  [<u>Id.</u> at 178-79].  Dr.

Taylor stated that Abi-Aad was not able to perform light or sedentary work on a full-time basis

due to his depression, anxiety, PTSD, and arthritis" and was not certain on when Abi-Aad will

regain the ability to perform the demands on a full-time basis.  [<u>Id.</u> at 282-83].  Before a visit

with Dr. Taylor on April 27, 2020, Abi-Aad attended the EMG but did not complete the test

because he could not tolerate the needles.  [Dkt. 34-5 at 179].

On January 24, 2020, Dr. Taylor reevaluated Abi-Aad where he noted his continued

psychological issues and documented complaints of joint pain despite being prescribed pain

medications.  [Dkt. 34-4 at 404-08].  In January, Unum reminded Abi-Aad that his benefits

would end on March 6, 2020.  [Id. at 368].  On February 3, 2020, Dr. Taylor wrote to Unum,

stating:

> Daniel Abi-Aad is a patient under my medical care.  He has a number of psychiatric
> and medical conditions that preclude work.  He also has chronic and severe joint
> pain for which he sees me and a rheumatologist.  The occupational demands that
> are listed includ[e] light work.  As noted above I do not feel he is capable of any
> work environment.  Lifting, carrying and pushing would not be able to be carried
> out by this patient as well as reaching fingering and travel.  Sedentary work as noted
> would also be precluded again due to the constellation of difficult[ies] that he is
> having.  He is motivated to treat and resolve his psychiatric and medical conditions.
> He is consistently under follow-up with counseling and psychiatry as well as me
> and rheumatology.

[Id. at 387].

## 2.    Dr. Jha Clinical Analysis (Unum Reviewer)

After receiving the February 3, 2020 letter from Dr. Taylor, Unum conducted a claim

evaluation.  On February 24, 2020, Dr. Jha reviewed Abi-Aad's conditions to determine whether

he had a physical disability that keeps him from performing gainful employment.[2]  [See Dkt. 42-

1].  Dr. Jha reviewed evaluations from Dr. Taylor, Dr. Devlin, Therapist Mallory Horgan,

("Horgan"), and Psychology N.P., Martha Root ("Root").  [Id. at 2-3].  Based on these records,

Dr. Jha concluded that  the "[r]eview of [the] information in [the] file does not support that [Abi-

Aad] lacks [the functional capacity due to] any physical conditions" to complete job functions

that involve "[m]ostly sitting, may involve standing or walking for brief periods of time, lifting,

---

[2] Since Unum did not provide Dr. Jha's medical license or board certification, she does not qualify as a medical
reviewer, under ERISA.  See 29 C.F.R. §§ 2560.503-1(h)(3)(iii) (stating that "in deciding an appeal of any adverse
benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary
shall consult with a health care professional who has appropriate training and experience").  Unum, however, had
four qualified medical reviewers evaluate Abi-Aad's claim after Dr. Jha, and therefore, complies with ERISA.

carrying, pushing, pulling up to 10 [pounds] occasionally, . . . [o]ccasional reaching ([s]ide/desk level), occasional handling and frequent bilateral fingering." [Id. at 6-7].

Dr. Jha reached this conclusion because Abi-Aad's labs for inflammatory markers, for rheumatoid arthritis, and for connective tissue diseases were normal, which indicated that there was "no physical reason for reported joint pains and lack of [functional capacity]." [Id. at 6]. In support, Dr. Jha states that these issues are more likely related to Abi-Aad's behavioral health. [Id.]. For example, on January 30, 2020, Abi-Aad complained about his inability to drive due to pain. [Id.]. Dr. Jha concluded that based on his normal labs, Abi-Aad's statement is likely connected with his "reported history of having 'waves of panic when driving,' rather than [due to a] physical ailment." [Id.].

### 3.     Dr. Haller Review (Unum Reviewer)

Next, Unum had Dr. Haller[3] review Abi-Aad's claim to determine if he has a physical disability that keeps him from performing gainful employment. [See Dkt. 42-2]. Between February 28, 2020 and March 9, 2020, Dr. Haller reviewed the medical records to "address the insured's physical functional capacity." [Id. at 4]. On March 4, 2020, Dr. Taylor responded to a letter from Dr. Haller, inquiring whether Dr. Taylor was in agreement that the evidence does not support preclusion by a physical condition from performing sedentary work on a sustained full-time basis, and Dr. Taylor responded with "[n]o, I do not agree . . . Pain persists," without any elaboration. [Dkt. 34-4 at 463].

Dr. Haller also concluded that "[p]hysical exam findings do not support that the insured is precluded from performing the occupational demands outlined in the medical issue statement" because there are merely "areas of tenderness" with no "musculoskeletal or neurological

---

[3] Dr. Haller has a medical license in Maine and a board certification in American Board of Family Medicine. [Dkt. 42-2 at 6].

abnormalities." [Dkt. 42-2 at 4-5].  In addition, Dr. Haller stated that Abi-Aad's diagnostic

testing and imaging and the intensity of management, such as the absence of referrals for pain

management consultation or physical therapy and the lack of follow through with the EMG, did

not support a finding in favor of Abi-Aad's physical disability.  [Id. at 5-6].  Further, Abi-Aad

stated he did not like driving during a June 2018 visit, yet an activity check showed him driving

on June 8, and on December 16, 2019, he reported his pain limited him to laying on the couch,

yet he reported going to the gym and walking outdoors.  [Id. at 5].  Finally, Dr. Haller noted that

although Dr. Taylor stated in a letter dated February 3, 2020, that Abi-Aad was receiving

rheumatology treatment, there is nothing in his medical record to support this claim.  [Id.].

### 4.      Dr. Bright Review (Unum Reviewer)

Unum had Dr. Bright[4] review Abi-Aad's claim as well.  [See Dkt. 42-3].  On March 11,

2020, Dr. Bright performed a consultation and concurred with Dr. Haller and Dr. Jha that there

was nothing in the record to support physical disability due to chronic pain.  [Id. at 2].  Dr.

Bright acknowledged that Abi-Aad complains of joint pain but concluded that:

> [t]he clinical evidence failed to support the functional impairment secondary to his joint pain.  There was no mention of any decreased motor strength, decreased range of motion, or any requirement of any assistive devices needed for ambulation, only tenderness was noted on the claimant's physical examinations for the period under review.

[Id. at 3].  In addition, based on Dr. Taylor's physical examinations there was "no acute

distress," "negative lab work," and "unremarkable" diagnostic imaging.  [Id.].  Finally, despite

medications, there was no further medical treatment or referrals to physical therapy, and Abi-

---

[4] Dr. Bright has a medical license in Georgia and a board certification in Family Practice.  [Dkt. 42-3 at 3].

Aad did not complete the EMG.  [Id.].  Based on these findings, Unum provided Abi-Aad a letter

stating his LTD benefits would expire on March 6, 2020.  [Dkt. 34-4 at 498-99].

After receiving the letter, Abi-Aad's saw Dr. Taylor on March 23, 2020, where he

documented that Abi-Aad was suffering from chronic joint pain and prescribed Gabapentin, a

nerve pain medication, and Celebrex, a nonsteroidal anti-inflammatory drug.  [Dkt. 34-5 at 182-

84].  On April 27, 2020, Dr. Taylor once again increased Abi-Aad's Gabapentin to three times

daily due to Abi-Aad's "complain[ts] of varying locations of pain."  [Id. at 179].  On May 12,

2020, Dr. Taylor stated:

> Daniel continues to complain of severe and worsening joint pain . . . The joint pain
> is described as multiple areas including his neck, back, wrists, ankle and hip.  He
> still has soreness where they attempted to do an EMG in his hand.  He was declined
> disability due to lack of objective evidence for the amount of pain he is having.  He
> is on maximum therapy short of opiates which I will reluctantly prescribed for
> bedtime. I have also recommended CBD trial when marijuana is available.  I will
> attempt to discuss with his rheumatologist.  I doubt pain clinic will be of much
> benefit.

[Id. at 175].  During another visit on June 24, 2020, Dr. Taylor noted that Abi-Aad had

pain in his joints, swelling in his left foot, prescribed a low dose of Prednisone, and ordered

a second rheumatological opinion for the possibility of seronegative rheumatoid arthritis.

[Id. at 168-70].

On July 16, 2020, Abi-Aad had an FCE.  [Dkt. 34-5 at 205-10].  The FCE noted

that Abi-Aad "did not demonstrate the ability to perform within the SEDENTARY

Physical Demand Category," due to "his need to alternate sitting and standing."  [Id. at

205].  During the test, Abi-Aad demonstrated consistent effort and reported reliable pain

ratings 83.3% of the time.  [Id.].  However, Abi-Aad's performance on the McGill Pain

Questionnaire was performed, the results suggested "poor psychodynamics and the

potential for unreliable pain reports during functional testing."  [Id. at 207].  On July 17,

2020, Dr. Taylor documented that Abi-Aad had "generalized myalgias and arthralgias" after the FCE was performed and he prescribed Abi-Aad one week of Prednisone.  [Id. at 165].

On August 28, 2020, rheumatologist, Sharon Stotsky, M.D. ("Dr. Stotsky"), evaluated Abi-Aad, and found as follows:

> Symptoms include joint pain, joint swelling (left ankle), joint stiffness (numbness, tingling), decreased range of motion and morning stiffness.  Symptoms are located in the neck, upper back, lower back, left shoulder, left hip, left ankle, left foot, right shoulder, right hip, right ankle and right foot.  The patient describes the pain as dull and aching. Onset was 2 year(s) ago.  The patient describes this as moderate in severity and unchanged (with current treatment from PCP).  Symptoms are exacerbated by direct pressure.  The pain radiates to the shoulder, upper arm, forearm, hip and lower leg. Associated symptoms include fatigue, muscle weakness, myalgia and dry mouth . . . Mr. Abi-Aad's abnormal physical exam findings included decreased range of motion in the neck; neurologic upper extremities: right intrinsic 4-/5; Left 4/5; in the pelvic region: tenderness over SI [sacroiliac] joint bilaterally with decreased forward bending; ulnas, a bony nodule present bilaterally, and positive drop wrist deformity bilaterally.  He has reducible hammertoes and dropped wrist with ulnar bulge.  He appears to have atrophy of the intrinsic muscles of both hands and about the metatarsals of the feet.  He has tenderness about the sacroiliac joints.  His presentation is consistent with the presence of an inflammatory arthritis.  Will give Enbrel 50mg s.q. in office and recheck in one week.

[Id. at 234-37].  On September 8, 2020, Dr. Stotsky reevaluated Abi-Aad and documented that Enbrel, a biological drug, helped, but that he had migraines and lower back pain, along with numbness in his fingers, cracks in his knuckles, and stiffness in his hands.  [Id. at 244-46].  Dr. Stotsky further stated that "Enbrel improved his ankles, shoulders, wrists and fingers for 2 days and then his fingers, wrists and shoulders have become stiff again and painful again."  [Id. at 244].  On September 22, 2020, Dr. Taylor agreed with the results of the FCE, and stated that Abi-Aad was physically not able to work.  [Id. at 164].  When asked to "identify the clinical findings and objective signs" that Abi-Aad is not able to work, Dr. Taylor provided "Pain,

PTSD, depression." [Id. at 163, 164].  On October 16, 2020, Abi-Aad appealed Unum's decision

to terminate his claim for LTD benefits.  [Id. at 151-54].

### 5.      Dr. Haller Review (Unum Reviewer)

Unum had Dr. Haller review Dr. Taylor's and Dr. Stotsky's records and the FCE results

to determine if the new findings should invoke another review of the claim decision.  [See Dkt.

42-4].  Dr. Haller concluded that the additional information should not change Unum's decision

to terminate Abi-Aad's benefits because a physical disability did not keep him from performing

gainful employment.  [Id. at 3].  Dr. Haller stated that although Dr. Stotsky initiated treatment for

inflammatory arthritis, Abi-Aad's medical information does not support a rheumatologic

condition.  [Id. at 5].  In addition, Dr. Haller stated that the FCE is "inconsistent with other

information in the file" because the medical records do not reflect the findings and "are best

explained by the insured's [behavioral health] conditions."  [Id. at 5].

### 6.      Dr. Bress Review (Unum Reviewer)

Unum had a fourth medical reviewer, Dr. Bress[5], conduct a medical review.  [See Dkt.

42-5].  On November 5, 2020, Dr. Bress concurred with Dr. Haller's review of the new

information, which included additional input from Dr. Taylor and Dr. Stotsky and the FCE

findings.  [Id. at 3, 5; see also Dkt. 42-2].  Along with findings similar to Dr. Haller, Dr. Bress

noted the following exam findings: no acute distress; no mention from treating physicians or

FCE that the insured appeared fatigued, chronically ill, or that he had difficulty moving about the

exam room; no mention of cognitive difficulties during exams; normal mental status exams; no

rashes or vasculitis lesions on skin; no mention of decreased grip strength; no assistive device;

and the joint exams appeared normal with no signed of synovitis, effusions, bone overgrowth, or

---

[5] Dr. Bress has a medical license in Massachusetts and a board certification in Internal Medicine and Rheumatology.
[Dkt. 42-5 at 5].

crepitations.  [Dkt. 42-5 at 4-5].  In addition, the pertinent diagnostic studies were negative, reflecting normal results, except for mild chondrocalcinosis in both hands.  [Id. at 4].  Finally, the FCE stated the insured's performance "would suggest poor psychodynamics and the potential for unreliable pain reports during functional testing," which would "interfere with the ability to draw conclusions regarding his true physical capacity."  [Id.].

### 7.    Dr. Norris Review (Unum Reviewer)

Unum requested a fifth doctor, Dr. Norris[6], to perform a final review of the medical evidence.  [See Dkt. 42-6].  Based on his evaluation of the medical records, Dr. Norris stated that "[t]he limited findings on physical examinations were not [consistent with] the severity of physical symptoms as reported by [Abi-Aad], and the diagnostic evaluations did not support the presence of autoimmune/connective tissue disease or inflammatory arthritis."  [Id. at 8].  In addition, Dr. Norris examined the FCE and stated: "[t]he findings of the July 2020 FCE showed some evidence of inconsistency of effort, were inconsistent with findings on prior examinations by treating [Specialist Physicians], and were not time relevant regarding the insured's functional status as of the [March 6, 2020] claim closure."  [Id.].  Finally, Dr. Norris noted "[t]he physical [restrictions and limitations] opined by Dr. Taylor were not [consistent with] his documented minimal examination findings, the unremarkable diagnostic testing/imaging findings, or the stable and conservative level of treatment through the 3/6/20 claim closure."  [Id.].

Based on these five reviews, Unum upheld its decision to terminate Abi-Aad's claim on December 15, 2020.  [Dkt. 34-5 at 333-43].  On November 17, 2021, Plaintiff filed this action challenging Unum's decision to deny LTD benefits under the Policy.  There is no dispute that

---

[6] Dr. Norris has a medical license in Tennessee and a board certification in Family Medicine, Occupational Medicine, and Aerospace Medicine.  [Dkt. 42-6 at 8].

Abi-Aad has exhausted all of his administrative remedies, and that the present claim is ripe for review pursuant to ERISA.

## II.     LEGAL STANDARD

In a claim pursuant to ERISA, "the burdens and presumptions normally attendant to summary judgment practice do not apply." Doe v. Harvard Pilgrim Health Care, Inc., 974 F.3d 69, 72 (1st Cir. 2020) (citation omitted). Instead, a summary judgment motion contesting the denial of disability benefits under ERISA "is simply a vehicle for teeing up the case for decision on the administrative record." Id. (citation omitted). "A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator . . . authority to determine eligibility of benefits." Richards v. Hewlett-Packard Corp., 592 F.3d 232, 238-39 (1st Cir. 2010) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). The parties do not dispute that the Policy does not provide Unum with discretion in its claim review. Therefore, the Court's task is to independently weigh "the facts and opinions in that record to determine whether the claimant has met his burden of showing he is disabled within the meaning of the policy." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 518 (1st Cir. 2005); see also Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 852 F.3d 105, 111 (1st Cir. 2017) (stating that "the court may weigh the facts, resolve the conflicts in evidence, and draw reasonable inferences."). "While the court does not ignore facts in the record, the court grants no deference to the administrators' opinions or conclusions based on these facts." Orndorf, 404 F.3d at 516 (citation omitted). Therefore, "summary judgment in the ERISA context is akin to judgment following a bench trial in [a] typical civil case." Doe, 974 F.3d at 72. In sum, the Court's "guiding principle in concluding de novo review . . . is that the plaintiff bears the burden of proving he is disabled." Richards, 592 F.3d at 239 (alterations in

original) (citation omitted).  Therefore, in the context of the Policy, Abi-Aad must show that he was unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience due to physical disability, prior to the termination of his benefits for mental illness on March 6, 2020.  See id.

## III.  DISCUSSION

Abi-Aad asserts that Unum's doctors did not fairly review his claim, and the Court should therefore overturn its decision to deny LTD.  Abi-Aad also asserts that the reviewing physicians did not have the proper credentials to review his claim.  Unum argues that Abi-Aad does not show sufficient evidence that chronic pain renders him unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience due to physical disability.

### A.    Burden of Showing Disability

Abi-Aad fails to meet his burden to show the Court that there is objective evidence that his chronic pain rendered him unable to perform the duties of a gainful occupation.  See Richards, 592 F.3d at 239 (stating that the courts must determine whether the claimants met their burden "within the meaning of the policy").

To support Abi-Aad's claim, the Court reviews the evaluations from his three treating physicians, Dr. Taylor, Dr. Devlin, and Dr. Stotsky, and Abi-Aad's FCE, which states that he cannot perform any sedentary work.  [Dkt. 43 at 6].  Unum provides that its four reviewing physicians determined the FCE's conclusions are not supported by physical evidence, and that there is no objective evidence from Abi-Aad's treating physicians that he cannot perform any gainful employment.  [Dkt. 29 at 15-18].

Abi-Aad asserts that he suffers from a physical disability due to chronic pain that precludes him from performing a gainful occupation.  "Neurological conditions, such as [chronic pain], are notoriously difficult to verify objectively, and administrators cannot deny benefits simply on the basis that the claimant cannot be definitively diagnosed."  Al-Abbas v. Metro. Life. Ins. Co., 52 F. Supp. 3d 288, 297 (D. Mass. 2014) (citing Denmark v. Liberty Life Assurance Co. of Boston, 481 F.3d 16, 37 (1st Cir. 2007), vacated on other grounds, 566 F.3d 1 (1st Cir. 2009)).  If the illness does not have an objective clinical finding, "the proper approach is to consider 'the physical limitations imposed by the symptoms of such illnesses [that] do lend themselves to objective analysis.'"  Id. (alterations in original) (citing Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 17 n.5 (1st Cir. 2003)).

Despite differing diagnoses from his reviewing physicians, Abi-Aad's subjective complaints are supported by the fact that, for years, he attempted to alleviate pain by taking numerous prescription medications prescribed by three different medical doctors.  These diagnoses and medications may show that Abi-Aad had chronic pain, but he fails to meet his burden to establish that he is unable to perform the duties of any gainful occupation for which he was reasonably fitted by education, training, or experience.  See Richards, 59 F.3d at 239 (stating that the claimant must "me[e]t his burden of showing he is disabled within the meaning of the policy").

Three medical professionals Dr. Taylor, Dr. Devlin, and Dr. Stotsky, assessed Abi-Aad and prescribed numerous prescriptions, such as multiple opioids, Celebrex, Cymbalta, Gabapentin, Prednisone, Hydrocodone-Acetaminophen, Lidocaine, and Enbrel injections.  [See Dkt. 34-4 at 229-33, 297, 406; Dkt. 34-5 at 168, 172, 179, 184, 239].  On September 25, 2019, Dr. Devlin ordered x-ray and laboratory results that were normal.  [Dkt. 33-4 at 225, 232].  On

the same day, Dr. Devlin prescribed opioids for Abi-Aad's self-reported symptoms of aches in his wrists, lateral hips, lumbar spine, hands and feet, and hand numbness due to decreased sensation and paresthesia in his fingers. [See Dkt. 34-4 at 229-33]. In November 2019, Dr. Taylor diagnosed him with chronic pain syndrome, and further prescribed use of an opioid. [Dkt. 34-4 at 297].

In January 2020, Dr. Taylor re-evaluated Abi-Aad, discussed a CBD trial and increased his prescription for Cymbalta to treat depression, anxiety, and pain relief. [Id. at 406]. Abi-Aad saw Dr. Taylor on March 23, 2020, where he was prescribed Gabapentin, a nerve pain medication, and Celebrex, a nonsteroidal anti-inflammatory drug. [Dkt. 34-5 at 184]. On April 27, 2020, Dr. Taylor prescribed Lidocaine to his hip, which was sensitive to the touch. [Id. at 179]. On May 29, 2020, Dr. Taylor further documented that Abi-Aad was experiencing drowsiness as a side effect to taking Hydrocodone-Acetaminophen (a narcotic analgesic). [Id. at 172]. During another visit on June 24, 2020, Dr. Taylor prescribed Prednisone for complaints of continued joint pain. [Id. at 168]. In August 2020, Dr. Stotsky prescribed Enbrel after performing a physical exam, which found that Abi-Aad had a decreased range of motion, neurologic upper extremities, tenderness, and atrophy consistent with inflammatory arthritis. [Id. at 239]. Despite differing diagnoses, Abi-Aad's subjective complaints of chronic pain are supported by the fact that, for years, he attempted to alleviate pain by taking the numerous prescription medications prescribed by three different medical doctors.

Under the policy, however, Abi-Aad is not only required to provide objective medical evidence of the existence of his chronic pain. Abi-Aad also must show that chronic pain rendered him unable to perform a job for which he was reasonably fitted by education, training, or experience. See Richards, 592 F.3d at 239 (stating plaintiff has the burden of proof to show

he is disabled under the Policy).  Although "it is impermissible to require objective evidence to support claims based on medical conditions that do not lend themselves to objective verification, such as [chronic pain]," courts also make clear that "it is permissible to require objective support that a claimant is unable to work as a result of such conditions."  Desrosiers v. Hartford Life & Accident Ins. Co., 515 F.3d 87, 93 (1st Cir. 2008) (citing Boardman, 337 F.3d at 17).

The First Circuit determined that an FCE provides "objective clinical evidence," however, its conclusion should not be "blindly adopted."  Ehlert v. Metro Life. Ins. Co., No. CV 18-10357-MPK, 2020 WL 6871021, at *13 (D. Mass. Nov. 23, 2020) (quoting Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)).  This is particularly true for claims of disabling pain.  See e.g., Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp. 2d 261, 296 (1st Cir. 2008) (stating that "[FCE's] can neither prove nor disprove claims of disabling pain, nor do they necessarily present a true picture in cases involving [chronic pain] where the symptoms are known to wax and wane, thereby causing test results potentially to be unrealistic measures of a person's ability to work on a regular, long-term basis").

Abi-Aad submits the FCE as proof of his chronic pain rendering him unable to perform a gainful occupation.  [Dkt. 34-5 at 205-210].  Abi-Aad's job required sedentary work, which includes "[l]ifting, [c]arrying, [p]ushing, [p]ulling [twenty pounds] occasionally, frequently up to [ten pounds], or negligible amount constantly . . . [f]requent reaching, handling, fingering, keyboard use" and traveling.  [Dkt. 34-3 at 82].  The vocational assessments provided three gainful occupations that involve similar sedentary work, but "these occupations do not require greater than occasional reaching ([s]ide/desk level), occasional handling and frequent bilateral fingering."  [Dkt. 34-4 at 484].  Pursuant to the Policy, Abi-Aad must prove that he cannot perform any gainful occupation, and the Court may consider the vocational assessments, which

provided gainful occupations that he can perform based on Abi-Aad's training, education, and experience.  [Dkt. 34 at 31].  See Chandler v. Raytheon Emp. Disability Trust, 53 F. Supp. 2d 84, 91 (D. Mass. 1999) (stating that insurers may use vocational assessments as a tool to determine whether plaintiffs are disabled within the meaning of the policy).

The FCE concluded Abi-Aad's consistent effort demonstrated that he could not perform sedentary work due to "his need to alternate sitting and standing."  [Dkt. 34-5 at 205].  The FCE noted Abi-Aad demonstrated the ability to perform simple grasping on a frequent basis, and pinching, fine motor coordination, and gross motor coordination on an occasional basis.  [Id. at 207-08].  Abi-Aad also had the ability to lift, carry, push, pull, and climb stairs occasionally.  [Id. at 207-09].  The McGill Pain Questionnaire results suggested "poor psychodynamics and the potential for unreliable pain reports during functional testing."  [Id. at 207].

Unum's reviewing physicians disagreed with the results of the FCE.  See Gannon, 360 F.3d at 214 (stating that a "nonexamining physician's review of a claimant's file [is] reliable medical evidence").  First, Dr. Haller acknowledged the conclusions of the FCE report and conducted a review of the subtests of the FCE which reflected the following:

> the insured self-limited and some tasks such as firm grasp and off of ground static balance were avoided.  The insured's grasping trials reflect variability including increasing grasp strength on the right with each trial and decreasing strength on the left with each trial which is inconsistent with maximum effort.  The report also references the insured scored 44 on the McGill Pain Questionnaire and notes this result would suggest poor psychodynamics and the potential for unreliable pain reports during functional testing.  The insured's limiting behaviors on the exam therefore precluded an adequate assessment of capacity and interfere with the ability to draw conclusions regarding his true physical capacity.

[Dkt. 42-4 at 4].  In his analysis, Dr. Haller also noted that Abi-Aad's performance during the FCE reflected "upper extremity function inconsistent with the severity of [Abi-Aad's] [December 16, 2019] reports," which stated that Abi-Aad's wrists were incredibly weak and that

he could barely move them.  [Id. at 5].  In addition, Abi-Aad's poor grip strength is not reflected

in the weakness and atrophy described by Dr. Stotsky six weeks later.  [Id.].  Finally, Dr. Haller

stated, "the insured's unremarkable gait as reflected during the ambulation, stair climbing, and

squatting portions of the [FCE] are inconsistent with the expected findings of an individual with

left ankle pain and swelling from uncontrolled inflammatory arthritis and intrinsic atrophy of the

foot muscles as referenced in Dr. Stotsky's records."  [Id.].

Second, Dr. Bress emphasized that the report notes, "the insured's performance 'would

suggest poor psychodynamics and the potential for unreliable pain reports during functional

testing,' which would 'interfere with the ability to draw conclusions regarding his true physical

capacity.'"  [Dkt. 42-5 at 4].  Third, Dr. Norris noted that the serial grip and pinch testing

showed variation values greater than fifteen percent, which suggests inconsistent effort.  [Dkt.

42-6 at 4].  Dr. Norris also concluded Abi-Aad's FCE was inconsistent with previous medical

records, and that the physical restrictions and limitations were not consistent with his

documented minimal examination findings, diagnostic testing, imaging findings, or

inconsistency of treatment.  [Id. at 8].

These three medical reviewers relied on objective clinical evidence to discredit the FCE's

conclusion that Abi-Aad is unable to perform the demands of a sedentary occupation.  See

Lauziere v. Aetna Life Ins. Co., CV No. 13-10989-FDS, 2014 WL 12599818, at *5 (D. Mass.

Oct. 21, 2004) (stating that FCEs are not reliable evidence when they "reveal[ ] inconsistencies

indicating sub-maximal effort"); see also Lamanna, 546 F. Supp. 2d at 296 (stating that FCE's

"do [not] . . . necessarily present a true picture in cases involving [chronic pain]"); Dorsey v.

Provident Life & Accident Ins. Co., 167 F. Supp. 2d 846, 856 (E.D. Pa. 2001) (stating that "there

is evidence that an FCE is a highly questionable tool for determining whether a [chronic pain]

patient is disabled"). Also, since the FCE stated the insured's performance "suggest[s] . . . the potential for unreliable pain reports during functional testing," which would "interfere with the ability to draw conclusions regarding his true physical capacity," [Dkt. 34-5 at 207], the Court concludes that the FCE does not support Abi-Aad's claim that he cannot perform any gainful occupation for which he was reasonably fitted by education, training, or experience.

Abi-Aad's treating physicians did not provide sufficient explanations to prove that Abi-Aad is not able to perform a gainful occupation. Although Dr. Devlin and Dr. Stotsky's reports support Abi-Aad's medical condition of chronic pain, they do not support his inability to work. See Bowden v. Group 1 Auto., 359 F. Supp 3d 156, 166 (D. Mass. 2019) (holding that "most of [doctors'] reports go to their medical diagnosis of [disability] as opposed to whether [claimant] . . . cannot work"). Based on observations in December 2019, and February 2020, Dr. Taylor provided a conclusory explanation when he reported to Unum that Abi-Aad's arthritis prevented him from performing in any work environment, especially with the actions of lifting, carrying, pushing, reaching, fingering, and travel. [Dkt. 34-4 at 282-83, 387]; see Bowden, 359 F. Supp 3d at 166-67 (stating that since the "doctor does not explain how he is able to infer [the plaintiff's] total disability given the information he provided," the plaintiff did not meet his burden under the policy). The Policy specifically states that "[w]hile the usage of DOT physical demands (sedentary, light, medium, heavy, and very heavy) and frequency descriptors (occasional, frequent, prolonged and constant) provides a starting point for defining the physical requirements of a specific occupation, they are generally insufficient as standalone descriptions." [Dkt. 43-1 at 2]. The Policy also "requires further definition of their ability" based on physical demands involving movement, auditory and visual requirements, environmental factors, work hazards,

equipment usage, and cognitive skills required.  [Id. at 2-3].  Here, Dr. Taylor provides nothing more than DOT physical demands and frequency descriptors.

Unum's physicians disagreed with Dr. Taylor's conclusion that Abi-Aad could not work.[7]  At the time Unum terminated Abi-Aad's benefits, March 6, 2020, Dr. Jha stated that Abi-Aad could perform work consisting of: "[m]ostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 lbs. occasionally. . . [o]occasional reaching ([s]ide/desk level), occasional handling and frequent bilateral fingering." [Dkt. 42-1 at 6-7; Dkt. 42-2 at 6-7].  Dr. Haller also stated that "the reported symptoms, physical exam findings, diagnostic testing, reported activities, and intensity of management reflected in the file" do not amount to a physical condition that prevents him from performing an occupation. [Dkt. 42-2 at 5-6].

After Abi-Aad submitted the additional information, Unum asked Dr. Haller[8] and Dr. Norris if Abi-Aad could perform occupational demands.  [See Dkts. 42-4, 42-6].  Dr. Haller pointed out that the visits with Dr. Taylor from March 23, 2020 to July 17, 2020 were tele-health

[7] The reviewing physicians were provided a report of the Social Security ALJ decision granting disability benefits for Abi-Aad's mental illnesses.  [Dkts. 42-4, 42-5, 42-6].  The SSA found Abi-Aad's severe impairments included depressive disorder, anxiety disorder, and post-traumatic stress disorder.  [Dkt. 34-5 at 104].  The decision does not mention chronic pain once.  [See id. at 104-106].  The reviewing physicians do not rely on SSA decision determination for whether Abi-Aad had a permanent disability.  [Dkts. 42-1, 42-2, 42-3, 42-4, 42-5, 42-6].  Either way, the Court is not required to defer to the determination of the SSA.  See Pari-Fasano v. ITT Hartford Life & Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000) (stating that "the criteria for determining eligibility for Social Security disability benefits are substantively different than the criteria established by many insurance plans," and therefore "although a related Social Security benefits decision might be relevant to an insurer's eligibility determination, it should not be given controlling weight.").

[8] Abi-Aad argues that Unum should not have relied on Dr. Haller's review of Abi-Aad's appeal because it violates ERISA.  29 C.F.R. § 2560.503-1 (h)(3)(v) (stating that a health care professional who consults "shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal").  The Policy states that when new medical information is received, "the same medical professional who reviewed . . . the original medical information may review the new medical information . . . or a different medical professional may review the new medical information."  [Dkt. 43-1 at 6].  Unum, however, asserts that Dr. Haller only reviewed the new information to determine if it had changed the original claim decision, and if the new information did not have an effect, the appeal would then be undertaken.  [Dkt. 37 at ¶ 81].  Dr. Haller did not review his appeal, but only evaluated if an appeal should be undertaken, and therefore did not violate ERISA. Unum still had two other medical physicians review Abi-Aad's claim on appeal.

visits, therefore Dr. Taylor did not conduct physical examinations and the patients reports of swelling alone does not support inflammatory arthritis.  [Dkt. 42-4 at 3].  However, the Court takes judicial notice that the COVID-19 pandemic greatly interrupted in-person medical visits.  See Fortuna v. Town of Winslow, 607 F. Supp. 3d 29, 35 (D. Me. 2022) (stating that "[c]ourts presiding over similar cases have taken judicial notice of Public Health Orders and scientific consensus regarding the coronavirus") (citation omitted); see also Throw v. Kijakazi, No. 3:21-CV-170-JPK, 2022 WL 4592022, at *26 n.44 (N.D. Ind. Sept. 30, 2022) (stating the court takes judicial notice of the fact that "on March 13, 2020, the President of the United States declared a national emergency due to the COVID-19 virus").  Therefore, the Court does not credit Unum's argument here.

Further, Dr. Stotsky conducted a physical exam that indicated atrophy in the muscles of the hands and metatarsals of the feet, but the laboratory results do not support an inflammatory or rheumatologic process and there is no evidence of joint swelling.  [Dkt. 42-4 at 5].  Dr. Haller stated the inconsistencies from Dr. Taylor and Dr. Stotsky did reflect that Abi-Aad could perform occupational demands, and his symptoms are best explained by behavioral health conditions.  [See id.].  Dr. Norris did not find that the evidence presented by the treating physicians precluded Abi-Aad from performing sedentary level occupational activity because the intensity of the treatment remained conservative.  [Dkt. 42-6 at 8].  Dr. Norris also noted that Dr. Devlin advised Abi-Aad to receive a second opinion in 2019, but Abi-Aad did not see Dr. Stotsky until August of 2020, right before he appealed Unum's decision on October 16, 2020.[9]  [Id. at 6; Dkt. 34-5 at 151-54].

---

[9] As stated previously, the Court takes judicial notice that the COVID-19 pandemic affected the ability for patients to easily schedule medical appointments.  Therefore, the Court does not credit Unum's argument here.

Dr. Bress also found the negative exam findings outweighed the positive exam findings when looking at the record as a whole and concluded "if the insured has RA/inflammatory arthritis, it is either very mild or very well controlled."  [Dkt. 42-5 at 5].  Dr. Bress noted that the lack of response to Prednisone is "evidence against a diagnosis of RA/inflammatory arthritis" and despite multiple complaints and medications, Abi-Aad had not been referred to a pain specialist or physical therapy.  [Id.].  Despite the additional information from Dr. Taylor and Dr. Stotsky, the reviewing physicians found the minimal restrictions and limitations are not supported from a physical point of view, and Abi-Aad's medical records do not support an incapacity to perform a gainful occupation.

After independently weighing the facts and opinions in the record, the Court determines that Abi-Aad did not provide sufficient evidence that his chronic pain rendered him unable to perform the duties of any gainful occupation for which he is reasonably fitted by education, training, or experience.

## B.    Qualifications of Unum's Medical Reviewers

The Court also addresses Abi-Aad's argument that Unum's physicians lacked the appropriate licensing and training required to review his claim.  [Dkt. 32 at 19; Dkt. 38 at 11; Dkt. 43 at 15].  Under the Code of Federal Regulations, to decide an appeal of any adverse benefit determination, "the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii).  A "health care professional" that may engage in medical consultation for a named fiduciary is defined as, "a physician or other health care professional licensed, accredited, or certified to perform specified health services consistent with State law."  29 C.F.R. § 2560.503-1(m)(7).  Additionally, in response to a request for an

advisory opinion regarding the claims procedure regulation under Title I of ERISA, the

Department of Labor stated that nothing in 29 C.F.R. Section 2560.503-1(h)(3)(iii) "requires that

the health care professional consulted by the plan's named fiduciary . . . be licensed, accredited,

or certified in the State where the services were rendered or in the State where the claimant

resides."  Advisory Opinion 2005-16A (June 10, 2005).

Four reviewing physicians held a license to practice medicine in a state in the United

States.[10]  Three of the reviewing physicians practiced Family Medicine, Dr. Haller, Dr. Bright,

and Dr. Norris, which concerns a broad range of experience and training, sufficient to perform a

medical review regarding chronic pain.  See McCoy v. Prudential Ins. Co. of Am. & State St.

Corp., No. 05-CV-11283, 2007 WL 9797627, at *5 (D. Mass. June 12, 2007) (stating that

healthcare administrators do not need medical reviewers in the specialty of plaintiff's alleged

disability); DePardo v. MFS/Sun Life Fin. Distribs., Inc., No. 04-CV-10248-DPW, 2005 WL

1225977, at *3 (D. Mass. May 20, 2005) (allowing family practitioner to review LTD claim for

disability due to cardiac disfunction).  Additionally, Dr. Bress has a board certification in

Internal Medicine and Rheumatology, which is the specialization for Abi-Aad's asserted physical

disability, chronic pain.  See 29 C.F.R. 2560.503-1(h)(3)(iii).  The reviewing physicians were

health care professionals that had the appropriate experience and training to provide a

recommendation for Abi-Aad's LTD claim.

## IV.    CONCLUSION

For the foregoing reasons, Abi-Aad's motion for summary judgment [Dkt. 31] is

**DENIED**, Unum's motion for summary judgment [Dkt. 28] is **GRANTED**.

---

[10] Unum did not provide Dr. Jha's license credentials.  [Dkt. 38 at 11].  At oral argument, Unum stated that Dr. Jha was a "nonphysician reviewer."  ERISA only requires that the named fiduciary consult with "a health care professional."  29 C.F.R. 2560.503-1(h)(3)(iii).  Unum had four other qualified health care professionals review Abi-Aad's claim.

**SO ORDERED.**

Dated: April 7, 2023

<u>/s/ Angel Kelley</u>
Hon. Angel Kelley
United States District Judge